IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 26, 2009

STATE OF TENNESSEE v. TAMMY L. MCDONALD

Appeal from the Circuit Court for Blount County
No. C-16718    David R. Duggan, Judge

No. E2008-02747-CCA-R3-CD - Filed January 15, 2010

The Defendant, Tammy L. McDonald, appeals her conviction upon a guilty plea in the Blount County Circuit Court for theft of property over $60,000, a Class B felony. Pursuant to a plea agreement, the Defendant received a Range I, ten-year sentence with the manner of service to be determined by the trial court. At the sentencing hearing, the trial court ordered the Defendant to serve the sentence in confinement. The Defendant appeals, contending that the trial court erred in denying alternative sentencing. We affirm the judgment of the trial court.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee (on appeal); Raymond Mack Garner, District Public Defender, and Stacey D. Nordquist, Assistant Public Defender, (at trial), for the appellant, Tammy L. McDonald.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Tammy M. Harrington, Assistant District Attorney General, for the appellee, State of Tennessee.

OPINION

This case arises from the Defendant's theft of over $60,000 from Cherokee Millwright Corporation (Cherokee). At the sentencing hearing, Mark Grayson, the Chief Executive Officer of Massey Group, which owns Cherokee, testified that the Defendant was employed as the office manager and was responsible for some of the bookkeeping duties and for

supervising two other bookkeepers. He said that she was considered to be a good employee and that she held a position of trust in the company. He said that in January or February 2007, there were some outstanding bank statement reconciliations and that when the company questioned the Defendant, she replied that she had taken the bank statement reconciliations home. He said this was against company policy. He said that when the Defendant returned the bank statements, pages were missing. He said that after an investigation, the company determined that electronic payments of between $10,000 and $13,000 were made each month to a VISA card payment center. He said that he had directed the Defendant to close all Cherokee's VISA accounts in 2005 and that the electronic payments to VISA began in September 2005. He said that he asked the Defendant to produce the VISA account statements because the storage of those documents was her responsibility. He said the records were missing for the VISA account to which the monthly payments were made. He said the Defendant denied knowledge of the VISA account or the whereabouts of the statements. He said the Defendant produced a copy of a check in the amount of $13,533.61 made payable to a supplier, Kenny Pipe, to explain one payment on the bank statements. He said that when he contacted Kenny Pipe, he learned that the actual invoice was for a few hundred dollars and that the copy of the check the Defendant had produced was fraudulent.

Mr. Grayson testified that the Defendant kept the company's documentation in order and that it was unusual for documents to be missing. He said he and the Defendant ended their conversation and agreed to resume it the next morning. He said the Defendant left a voicemail message that night saying she would not return to work and asking an employee to box her personal belongings and leave them outside. He said he was able to obtain copies of the missing VISA account statements later, which reflected charges for airplane tickets, hotels, rental cars, purchases at department stores, flowers, and sporting event tickets. He said that he learned that all Cherokee's VISA accounts had been cancelled except the one that the Defendant retained. He said that the charging limit had been increased and that the total amount of charges ranged from $10,000 to $15,000 per month. He said that he determined the Defendant caused the company to issue checks to pay the VISA card balance and that the total amount issued was $190,480.52. He said that insurance reimbursed the company for $108,459.73, leaving an outstanding balance of $82,020.79. The VISA card statements from August 2005 to April 2007 were received into evidence.

Mr. Grayson testified that after the Defendant left her employment, he learned that she attempted to purchase tickets to a college basketball tournament. He said the company learned through a ticket broker that the Defendant had made many purchases and had directed them to be mailed to her home address in Louisville, Tennessee, but to be billed to the Cherokee address. He asked the court to require the Defendant to serve some or all of her sentence in confinement because anything less would diminish the magnitude of the

crime. He said the impact on Cherokee had been severe because the company had to institute a number of measures to prevent further fraud and because the Defendant's crimes created a crisis of confidence within the company.

On cross-examination, Mr. Grayson testified that he interacted with the Defendant at Cherokee fairly frequently. He said that she performed well on job evaluations and that she was promoted a couple of times. He said that the Defendant was not shy about working overtime, that she had oversight over other personnel, that she worked on various accounting tasks and projects, and that she was a troubleshooter.

Michael Holloway, the vice-president of Broadway Electric Service Corporation (BESCO), testified that he employed the Defendant at his company as an accounts payable clerk from August 2007 to February 4, 2008. He said that the Defendant was responsible for credit card reconciliation and processing. He said she was terminated from her position for making fraudulent credit card charges to U-Store-It, Allegiant Air, Royal Caribbean Cruise Lines, and Cingular. He said that the Defendant lied when she was confronted and first stated that the credit card charges were made in error. He said that she later admitted she made the credit card charges and that she agreed to repay the company. He said that the company had not been repaid and that it had filed criminal charges against the Defendant in Knox County, which were still pending. A summary of the credit card charges and the warrant were received into evidence. On cross-examination, Mr. Holloway testified that the Defendant charged over $1,000 to the company credit card.

David Carter, a probation officer with the Board of Probation and Parole, testified that he conducted the presentence investigation report concerning the Defendant. He said that the Defendant did not reveal her previous employment with Safety and Ecology Corporation (SEC) on the presentence investigation questionnaire. He said that when he reviewed the Defendant's affidavit of indigency, he discovered that she had been employed with SEC before her employment with BESCO. He said that when he questioned the Defendant about the discrepancy, she responded that the employment with SEC had been brief and that she had forgotten about it. He said that she later admitted she had fraudulently "cut" herself checks totaling $6,000 but that she had made restitution to the company and was not criminally charged. He said that pursuant to the Defendant's executed Release of Information form, he received documents from SEC related to the Defendant's employment. He said the documents revealed that the Defendant used the $6,000 to pay for a trip to Israel.

Mr. Carter testified that he reviewed the State's case file and determined that the Defendant was interviewed by detectives about the case on May 12, 2007, and that the Defendant continued to write fraudulent checks after that date. He said the Defendant admitted a 1988 arrest and conviction in Ouachita Parish, Louisiana, for passing worthless

checks and for which she received three years' probation. He said that he was contacted by a Louisiana Department of Corrections officer who informed him that the Defendant had absconded from probation and that she had been arrested in Kentucky on August 28, 1991. He said that the Kentucky court had declined to return the Defendant to Louisiana for a revocation hearing because her probation sentence had expired. He said the Louisiana officer informed him that the Defendant owed $2,271.99 on an outstanding balance in Ouachita Parish. He said that the Defendant was also arrested in Kentucky on August 26, 1991, for theft and that the Defendant was arrested in Blount County on November 8, 1996, for theft of property between $500 and $1,000, for which she received an eleven-month and twenty-nine-day suspended sentence.

On cross-examination, Mr. Carter testified that the Defendant informed him that the Blount County arrest had been for passing worthless checks. He said that he was not able to obtain information about whether the Defendant had violated her probation in the 1991 and 1996 cases because the records had been "purged." He said that he did not find any arrests of the Defendant between 1996 and 2008. The victim impact statement and presentence report were received into evidence.

Maryville Police Detective Sergeant Carlos Hess testified that he was assigned to the Cherokee case and that he began his investigation in March 2007. He said that he asked the Defendant to come to the Maryville Police Department for an interview and that he interviewed her on May 10, 2007. He said that he did not give Miranda warnings because the Defendant was not under arrest. He said that the Defendant gave a statement which was audio- and video-recorded and that she issued a written statement in which she admitted responsibility for her actions at Cherokee and expressed her desire to make amends. He said that he was not aware that the Defendant was working for SEC at the time. He said that after the Defendant was indicted, he learned that she traveled to Israel. He said her bond did not restrict foreign travel.

On cross-examination, Detective Hess testified that he could not recall the Defendant's telling him she was employed and that he thought she was trying to find a job. He said that they had conflicts arranging a time to meet but that the Defendant was willing to come to the station and speak to him.

The defense called Patricia Lonesberry, the Defendant's mother, who testified that the Defendant lived with her and had two children, ages sixteen and twenty-five. She said that the Defendant's older child was mentally handicapped, that they lived with her because they needed the extra help, and that the Defendant paid her $250 per week in rent. She said she believed the Defendant needed very disciplined mental evaluations and that incarceration would not provide the help the Defendant needed. She said the Defendant received mental

health treatment in Louisiana and was diagnosed with a chemical imbalance. She said the Defendant did well as long as she stayed on medication and received counseling. She said that she was unaware of the Defendant's offenses until the Defendant was arrested. She said she would care for the children if the Defendant were sentenced to jail. She said that she did not know how the Defendant spent the money, except that the Defendant took her younger son on trips. She agreed that the Defendant was not violent. She said that she worked part time and that no one else lived at her home other than herself, the Defendant, and the Defendant's sons.

On cross-examination, Ms. Lonesberry testified that she traveled with her daughter on one trip to Florida. She recalled that the Defendant sometimes rented cars to go on trips. She said that the Defendant sent her flowers and cookie baskets and that the Defendant took the children to sporting events. She said that she was aware the Defendant had stolen nearly $200,000 from Cherokee. When asked if she knew that the Defendant had stolen over $6,000 from SEC, she replied that she did not. She said she knew about the theft from BESCO. She said that there was some discussion about the Defendant's returning to counseling after the thefts came to light but that "it didn't go anywhere."

The Defendant testified that the other witnesses' testimony was correct. She clarified that when she was on probation in Louisiana, her employer transferred her to Kentucky and that the probation officer allowed her to leave the state as long as she continued to make restitution. She said she believed that she had made full restitution for the Louisiana conviction. She said the charges in Louisiana and Kentucky were for passing bad checks. She said that she moved to Tennessee in 1991.

The Defendant testified that her job at Cherokee was very demanding and stressful and that she worked long hours and weekends. She said that she spent money to get relief from the stress but that afterwards, she would experience additional stress because she knew that using the company's credit card was wrong. She said that the majority of the purchases were for her younger son. She said that she increased the credit limit to have access to more money and that she received a "high" from spending and "getting away with it." She said that she had no animosity toward any of the people for whom she had worked and that she did not admit her wrongdoing when confronted because she was scared. She said that she had made several appointments for counseling but that she had not followed through because she was ashamed of admitting and talking about what she had done. She admitted that she received counseling for a month in Louisiana, at the suggestion of her mother, after she was caught passing a worthless check and that she was diagnosed with depression and a chemical imbalance. She admitted that she was prescribed medication, which she later stopped taking. She said that she did not drink alcohol or use illegal drugs and that the only prescription medication she took was for her sinuses.

The Defendant testified that she was due to appear in a Knox County court on charges of theft from BESCO on the morning after the hearing and that her sentence there was likely to be two years' probation. She said that she admitted everything to Detective Hess because he had all the evidence and she knew that she would not be able to hide what she had done. She said that she was not presently working and that she did not know how she would make restitution of more than $82,000 because she did not know who would hire her after her conviction. She said that she believed she deserved jail time but that she also needed to raise her sons and receive counseling. She admitted that her older son had a low IQ and was not able to maintain a regular job. She said that her mother was scheduled to have knee replacement surgery and that she would be her mother's primary care giver.

On cross-examination, the Defendant admitted that she was asking the trial court to give her both jail time and leniency in order that she could take care of her mother and sons. She admitted that she had not told her mother or her sons the whole truth about her charges because she was embarrassed and ashamed. She said her behavior was wrong, but she would not agree that it was selfish because she was trying to spare her family. She acknowledged that although she loved her family, she had done nothing to prepare her children for the fact that she might go to jail. She admitted that she said she wanted counseling but had not sought treatment in the year and a half since her indictment. She acknowledged that she had held three good jobs and that she did not have to steal money from the companies. She admitted that she had continued to embezzle funds from SEC after she had admitted to and had been indicted for her thefts at Cherokee. She agreed that she was a highly valued employee in a position of trust and that she received a benefit from her embezzlement in that it afforded her a higher standard of living. She agreed that she sought jobs where she had access to financial records and money.

The trial court noted that the Defendant was charged with a Class B felony and that the presumption regarding alternative sentencing did not apply. The court found that probation or split confinement was not appropriate and sentenced the Defendant to ten years in confinement in the Department of Correction as a Range I, standard offender.

On appeal, the Defendant contends that the trial court improperly sentenced her to serve her full sentence in confinement because it did not specify what evidence in the record supported findings that incarceration would deter others from committing theft offenses, that this theft was worse than any other theft, and that incarceration was necessary to protect the public. The State contends that the trial court properly sentenced the Defendant to ten years in confinement and that it considered the circumstances of the offense, the Defendant's criminal history, and her admitted criminal behavior before and after the offense.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2006). This presumption of correctness is conditioned upon the affirmative showing that the trial court considered the relevant facts, circumstances, and sentencing principles. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). As the Sentencing Commission Comments to section 40-35-401(d) note, the burden is now on the appealing party to show that the sentence is improper.

When determining if confinement is appropriate, the trial court should consider whether (1) confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct, (2) confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to people likely to commit similar offenses, or (3) measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant. T.C.A. § 40-35-103(1)(A)-(C). The trial court may also consider a defendant's potential or lack of potential for rehabilitation and the mitigating and enhancement factors set forth in Tennessee Code Annotated sections 40-35-113 and -114. T.C.A. §§ 40-35-103(5), -210(b)(5); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). The sentence imposed should be the least severe measure necessary to achieve the purpose for which the sentence is imposed. T.C.A. § 40-35-103(4). If a defendant is an especially mitigated or standard offender convicted of a Class C, D, or E felony, he or she should be considered as a favorable candidate for alternative sentencing in the absence of evidence to the contrary. T.C.A. § 40-35-102(6).

Regarding the denial of probation, the trial court noted the Defendant's long history of committing theft offenses and stated that it payed particular attention to the fact that the Defendant acquired a new criminal charge while on bond for the present offense. The court found a "very high risk" that the Defendant would commit another crime in light of the offenses that she committed after she was indicted. The court found that it did not reasonably appear that the Defendant would abide by the terms of probation. The court also found that the interests of society in being protected from possible future criminal conduct by the Defendant were great and that several measures less restrictive than confinement had been applied unsuccessfully to the Defendant. The court found that granting probation would depreciate the seriousness of the offense and that confinement would be particularly suited to provide an effective deterrent to others likely to commit similar offenses.

The record reflects that the trial court considered the statutory enhancement and mitigating factors in Code sections 40-35-113 and -114. It found that enhancement factor (1) applied, that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. The court stated that this factor should weigh heavily in sentencing the Defendant because the Defendant

committed two similar offenses after she committed the present offense. The court applied enhancement factor (8), that the Defendant before trial or sentence failed to comply with the conditions of a sentence involving release in the community, because the Defendant committed criminal activity while on bond. The court also found that factor (14) applied, that the Defendant abused a position of private trust in a manner that significantly facilitated the commission of offense, because of the abuse and breach of trust of the company by the Defendant. The court found one mitigating factor, that the Defendant's criminal conduct neither caused nor threatened serious bodily injury. Thus, the Defendant's argument that the trial court must state its findings before denying probation fails because the trial court stated its findings in detail. The trial court's denial of probation is amply supported by the record on appeal. The Defendant has not demonstrated that total confinement was improper.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____

JOSEPH M. TIPTON, PRESIDING JUDGE